UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 08-61422-CIV-COHN/SELTZER

CHICK-FIL-A and CFA-NC
TOWNRIDGE SQUARE, LLC,

     Plaintiffs,

vs.

EXXONMOBIL CORPORATION,

     Defendant.

_____/

<u>ORDER ON PLAINTIFF'S MOTION TO COMPEL</u>

THIS CAUSE is before the Court on Plaintiff Chick-fil-A's Motion to Compel Discovery (DE 74) and the Court having heard argument of counsel and being otherwise sufficiently advised, it is hereby ORDERED that the Motion is GRANTED in part and DENIED in part for the reasons set forth below.

<u>BACKGROUND</u>

Plaintiffs, Chick-fil-A and CFA-NC Townridge Square, LLC (collectively, "Chick-fil-A"), bring this action against ExxonMobil Corporation ("Exxon") under the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6901 *et seq.*, seeking to require Exxon to halt and remediate alleged contamination of property arising from leaking underground storage tanks at an Exxon service station (the "Exxon Site") in Coral Springs, Florida. Based on this alleged contamination, Chick-fil-A also asserts a claim for violation of the Florida Discharge Prevention and Removal Act, Fla. Stat. § 376.30 *et seq.*, as well as state common law claims for negligence, nuisance, and trespass. In addition, Chick-fil-

A asserts a claim for tortious interference with a contract and a claim for tortious interference with an advantageous business relationship.

The following facts are pertinent to the tortious interference claims.  On January 12, 2006, Chick-fil-A purchased four parcels of property pursuant to a Special Warranty Deed. The property consists of three contiguous undeveloped lots (the "Townhome Property") and an additional lot adjacent to and west of the Townhome Property (the "Restaurant Property").[1]  That same month, Chick-fil-A entered into a contract to sell the Townhome Property for $975,000 to a local residential developer, Coral Square LLC ("Coral Square"); the Restaurant Property was not part of the Coral Square agreement.[2]  Coral Square had planned to build townhomes on the property.  By letter dated September 25, 2007, Coral Square notified Chick-fil-A that it was terminating its contract to purchase the Townhome Property "since a mutually agreeable environmental remediation plan for the Property has not been reached."  September 25, 2007 letter (Ex. Q, DE 105-18).[3]  Chick-fil-A contends that because it put Exxon on notice of the existence of the Coral Square purchase agreement and the impact of the alleged contamination to the Townhome Property, Exxon tortiously interfered with Chick-fil-A's contractual and business relationship with Coral Square by failing to remediate and eliminate the source of the Townhome Property

---

[1]  A Chick-fil-A restaurant and a Ritz Camera store are located on the Restaurant Property; this action does not involve that property.

[2]  Chick-fil-A deeded its interest in the Townhome property and in the Coral Square Agreement to Plaintiff CFA-Townridge Square LLC.

[3]  Under an addendum to the purchase contract, Coral Square retained its right to terminate upon failure to obtain "a mutually agreeable environmental plan for the Property."  Sixteenth Addendum (DE 106-7).

contamination.

<u>PLAINTIFF'S MOTION TO COMPEL</u>

During the course of discovery, Chick-fil-A deposed Celeste Quiralte as one of Exxon's corporate representatives; Quiralte is currently one of Exxon's in-house counsel in the environmental and safety section.  <u>See</u> Quiralte Deposition Transcript, Ex. B (DE 74).  In response to Chick-fil-A's notice to depose Exxon's corporate representative pursuant to Federal Rule of Civil Procedure 30(b)(6), Exxon designated Quiralte as its representative to testify as to five topics,[4] for the period 2006 through 2007 (and early

---

[4]  Quiralte was designated to testify as to the following topics:

1.  Any actions taken in response to any suspected or actual environmental conditions, safety concerns or related issues present at the ExxonMobil Site or any adjacent property, including but not limited to the CFA Property [Topic 3];

2.  Any communications with CFA regarding the subject matter of this litigation [Topic 5];

3.  Any communications with Denyse O'Grady, Coral Square, LLC [buyer under contract to purchase the Townhome Property], or Ascendant Real Estate Group regarding the subject matter of this litigation [Topic 6];

4.  Any appraisal and/or valuation of the ExxonMobil Site or the CFA Property or any property adjacent to the ExxonMobil Site [Topic 10]; and

5.  Any communications with any actual or prospective owners of the CFA Property or any property adjacent to the ExxonMobil Site regarding environmental conditions at the ExxonMobil Site [Topic 15].

Notice of Taking 30(b)(6) Deposition (DE 81-2).

2008 as to some matters).[5]  During the time period for which she was to testify, Quiralte was with the law firm of Gradere, Wynne & Sewell, which then served as Exxon's outside counsel.  Quiralte testified that in preparing for her deposition, she had reviewed some documents, focusing on correspondence between Exxon and Chick-fil-A; she, however, brought no documents to the deposition.

In response to an inquiry by Chick-fil-A's attorney, Quiralte testified that between early to mid-January 2007 and late September 2007, she had  several conversations with Denyse O'Grady, the owner of  Coral Square (the prospective purchaser of the Townhome Property).  When asked about the existence of any notes of these conversations, Quiralte testified that she had one such note that  memorialized her last conversation with O'Grady.  Upon Chick-fil-A's attorney's request, Exxon's attorney produced a copy of a one-page memorandum dated September 25, 2007, addressed to the Gardere firm's file; at the top of the memorandum the words "Core Attorney Work Product" appear.  However, privileged information at the bottom of the memorandum (consisting of two sentences) had been redacted.  Exxon's attorney informed Chick-fil-A's attorney that it was he who had redacted the privileged information; Quiralte had no input into what was to be redacted.  Exxon's attorney explained to Chick-fil-A's attorney that the Memorandum produced (pursuant to Federal Rule of Evidence 612) after he had asked for it because Quiralte had used the document to refresh her recollection when preparing for her deposition.  In producing the document, Exxon's attorney also stated that to the extent that any unredacted information

---

[5]  Quiralte was the only corporate representative who testified as to these matters for that time period.

4

may also be deemed privileged, Exxon was not waiving its privilege.  Twice during the deposition, Exxon's attorney offered to provide Chick-fil-A's attorney with an unredacted copy of the September 25, 2007 Memorandum upon an agreement that Exxon would not be waiving any privilege by producing it.  Chick-fil-A's attorney refused both offers, stating that he would not agree that there would be no waiver.

Quiralte testified that she did not recall preparing any other memoranda or notes concerning her two to four other communications with O'Grady, but it was possible that she had done so.   According to Quiralte, she just put her September 25, 2007 Memorandum into the file; she did not send it to anyone.  When asked by Chick-fil-A's attorney, Quiralte testified that she had not reviewed the Gardere firm file in preparing for her deposition because she was not asked to do so. Quiralte added that she felt no need to do so because she was a participant in those conversations and recalled what had transpired. Quiralte also testified that in preparing for her deposition she had reviewed some other documents concerning the topics on which she had been designated, including privileged documents; however, she did not need those documents to refresh her recollection, as she recalled the events and communications contained therein.  And with the exception of the September 25, 2007 Memorandum, Quiralte did not know of any other attorney work product document concerning communications with Chick-fil-A.   On both direct examination and cross-examination, Quiralte testified as to matters she had learned during her conversation with O'Grady, as reflected in the September 25 Memorandum.

In the instant Motion, Chick-fil-A argues that Exxon "failed to fulfil its 30(b)(6) obligations" and "unfairly obstructed Chick-fil-A's discovery methods," Motion at 11 (DE

74); Exxon allegedly did so "[b]y (1) deliberately designating its former outside and current inside counsel as its 30(b)(6) corporate representative; (2) introducing the issue of 'good faith effort' into this case; (3) selectively refusing to provide testimony regarding Exxon's intent or specific actions related to intent; and (4) relying on 'Core Attorney Work Product' as a 'sword' to support its defense to Chick-fil-A's claims for tortious interference . . . . ." Id.

The Court will in turn consider four issues: whether Exxon has waived any protection afforded by the attorney work protect doctrine by voluntarily producing protected work product; whether Exxon has impliedly waived the attorney-client privilege and/or attorney work product protection by placing its "good faith" in issue; whether Exxon failed to sufficiently prepare Quiralte for a 30(b)(6) deposition; and whether Exxon's counsel obstructed Quiralte's deposition.

## Disclosure Waiver

Chick-fil-A argues that Exxon has waived its attorney work product protection by voluntarily producing Quiralte's September 27, 2007 Memorandum.   Although the protection afforded by the attorney work product doctrine is broad, it is not absolute and can be waived.  United States v. Nobles, 422 U.S. 255, 239 (1975).  As one district court recently noted:  "There is very little primary authority from the Eleventh Circuit Court of Appeals on what constitutes waiver of the work product privilege, but the overwhelming majority of persuasive authority from other circuits holds that voluntary disclosure of work product information to an adversary waives work product protection as to that information." Wood v. Archbold Med, Ctr., Inc., No. 7:07-CV-109, 2009 WL 3063392, at *2 (S.D. Ga.

Sept. 17, 2009); see, e.g., Montgomery County v. Microvote, 175 F.3d 296, 304 (3rd Cir. 1999) ("[V]oluntary disclosure to one's adversary of documents protected by the work-product privilege waives the privilege."); United States v. Mass. Inst. of Tech., 129 F.3d 681, 687 (1st Cir. 1997) ("[W]ork protect protection is provided against 'adversaries,' so only disclosing material in a way inconsistent with keeping from an adversary waives work product protection."); In re Steinhardt Partners, L.P., 9 F.3d 230, 235 (2d Cir. 1993) ("The waiver doctrine provides that voluntary disclosure of work product to an adversary waives the protection as to other parties."); In re Chrysler Motors Corp. Overnight Evaluation Program Litig., 860 F.2d 844, 846 (8th Cir. 1988) ("Disclosure to an adversary waives work product protection. . . .") (citations omitted).

The parties do not dispute that the September 25, 2007 Memorandum constitutes attorney work product or that Exxon voluntarily disclosed it to its adversary, Chick-fil-A. Accordingly, the Court finds that Exxon counsel's intentional, voluntary disclosure to Chick-fil-A of attorney Quiralte's Memorandum waived Exxon's work product protection.  The parties, however, do disagree as to the proper scope of that waiver.  Chick-fil-A contends that Exxon's production of and reliance on the Memorandum waives work product protection for all documents related to the subject matter of all topics for which Quiralte was designated as the corporate representative.  By contrast, Exxon argues that any waiver of work product protection should be limited to the information actually disclosed.[6]

---

[6] Chick-fil-A contends that Exxon selectively produced the September 25, 2007 Memorandum to gain a tactical advantage while Exxon contends that it merely produced the Memorandum to comply with Rule 612 because Quiralte had used the document to refresh her recollection.  Courts have differed as to whether work product materials reviewed by a witness to prepare for a deposition are subject to disclosure under Rule 612.

Courts have differed as to the proper scope of the waiver of work product protection. Compare Grunman Aerospace Corp. v. Titanium Metals Corp. of Am., 91 F.R.D. 84, 90 (E.D.N.Y.1981) ("[d]isclosure to an adversary waives the work product protection as to items actually disclosed") with Sinclair Oil Corp. v. Texaco, Inc., 208 F.R.D. 329, 335 (N.D. Ok. 2002) ("courts have found that a party that produces work product documents waives the work product doctrine with regard to the subject matter of the documents produced").

Federal Rule of Evidence 502, however, now governs the scope of any waiver of both the attorney-client privilege and work product protection.[7]  With respect to an intentional disclosure of privileged communications or information, Rule 502(a) provides:

> When the disclosure is made in a Federal Proceeding or to a Federal office or agency and waives the attorney-client privilege or work protect protection, the waiver extends to an undisclosed communication or information in a Federal or State proceeding only if:
>
> (1)    the waiver is intentional;

---

 See Nutramax Labs., Inc. v. Twin Labs., 183 F.R.D. 458, 467-68 (D. Md. 1998), and cases cited therein; see also In re Seroquel Prods. Liab. Litig., NO. 6:06-md-1769-Orl-22DAB, 2008 WL 21507, at *2 (M.D. Fla. Jan. 24, 2008) ("When a witness uses attorney work product to refresh his memory, the potential for conflict exists between Rule 612, which favors disclosure of materials to refresh a witness's recollection, and the work product privilege, as reflected in Federal Rule of Civil Procedure 26(b)(3))."  This Court, however, need not decide the issue; for whatever reason, Chick-fil-A voluntarily produced the Memorandum to Chick-fil-A.

[7]  Congress enacted Rule 502 on September 19, 2008.  See Pub. L. No. 110-322 § 1(a), 122 Stat. 3357-58.  Congress provided that "[t]he amendments made by this Act shall apply in all proceedings commenced after the date of enactment of this Act and, insofar as is just and practicable, in all proceedings pending on such date of enactment."  Id. at §1(c).  This action (commenced on September 9, 2008) was pending on the date Rule 502 was enacted.  The Court finds no reason that Rule 502 should not apply here; it would be both just and practicable to do so.

(2)   the disclosed and undisclosed communications or information concern the same subject matter; and

(3)   they ought in fairness to be considered together.

Fed. R. Ev. 502(a).  In arguing the proper scope of waiver of work product protection, neither party referred to Rule 502, and few courts have had occasion to comment on the application of the Rule.  One commentary, however, recently discussed the scope of waiver under Rule 502:

> Federal Rule of Evidence 502(a) curtails prior waiver doctrine significantly.  It directs that when privileged material protected as work product is disclosed "in a federal proceeding" . . . the disclosure does not work a waiver of protections for material on the same subject matter beyond that disclosed unless it was intentional and the additional materials "ought in fairness be considered" together with the protected materials turned over by the privilege holder. . . . The idea is to limit subject matter waiver to situations in which the privilege holder seeks to use the disclosed material for advantage in the litigation but to invoke the privilege to deny its adversary access to additional materials that could provide an important understanding of the privileged materials.

8 Charles A. Wright, Arthur R. Miller, and Richard L. Marcus, Federal Practice and Procedure § 2016.2 (3rd ed. 2009 Supplement).  The Advisory Committee Notes to Rule 502(a) further explain when a voluntary disclosure results in subject matter waiver:

> The rule provides that a voluntary disclosure in a federal proceeding or to a federal office of agency, if a waiver, generally results in a waiver only of the communication or information disclosed; a subject matter waiver (of either privilege or work product) is reserved for those unusual situations in which fairness requires a further disclosure of related, protected information, in order to prevent a selective and misleading presentation of evidence to the disadvantage of the adversary. See, e.g., In re United Mine Workers of America Employee Benefit Plans Litig., 159 F.R.D. 307, 312 (D.D.C. 1994) (waiver of work product limited to materials

9

> actually disclosed, because the party did not deliberately
> disclose documents in an attempt to gain a tactical
> advantage). Thus, subject matter waiver is limited to situations
> in which a party intentionally puts protected information into
> the litigation in a selective, misleading, and unfair manner.

Fed. R. Ev. 502 Advisory Committee Notes, Subsection (a).

Having found that Exxon's disclosure of its attorney work product (the September 25, 2007 Memorandum) was intentional (as opposed to inadvertent) and that such disclosure waived work product protection, this Court must now consider whether subject matter waiver is appropriate under the facts presented here, that is, whether additional materials "ought in fairness be considered" together with the September 25 Memorandum produced by Exxon.

Chick-fil-A alleges that Exxon tortiously interfered with its contractual and/or business relationship with Coral Square by refusing to remediate and eliminate the source of the contamination of the Townhome Property. And Coral Square's notice to Chick-fil-A stated that it was terminating the purchase agreement because "a mutually agreeable environmental remediation plan for the Property has not been reached." September 25, 2007 letter (Ex. Q, DE 105-18).  Exxon, however, denies this is the real reason for Coral Square's termination of the contract.  During Exxon's own examination of Quiralte at her deposition, Exxon's attorney elicited testimony as to the reasons O'Grady gave for Coral Square terminating its purchase agreement with Chick-fil-A, as reflected in Quiralte's September 25, 2007 Memorandum.

Further, in support of its summary judgment motion with respect to Chick-fil-A's tortious interference claims (DE 105), Exxon repeatedly contends that the reason that

Coral Square terminated the purchase agreement was because the real estate market had declined and it was no longer economically advantageous for Coral Square to continue with the purchase of the Townhome Property.  For example, Exxon states:  Plaintiff "actually lost the sale in the Coral Square Purchase Agreement because of the collapse of the South Florida real estate market. . . ." (Motion at 2); "The Coral Square Purchase Agreement was extended for approximately nineteen months until Ms. O'Grady decided that the market would not substantiate her purchase of the Townhome Property and she terminated the Coral Square Purchase Agreement. . . ." (Motion at 4); Ms. O'Grady's decision to terminate the Coral Square Purchase Agreement was induced by the declining real estate market, not ExxonMobil" (Motion at 16); and "The evidence confirms that Ms. O'Grady terminated the Coral Square Purchase Agreement because the market could not sustain the contract price for the Townhome Property, and it was no longer a viable deal for her," citing Quiralte's deposition testimony as reflected in the September 25, 2007 Memorandum) (Motion at 14).  The Court finds that it would be unfair to permit Exxon to produce work product supporting its contention that Coral Square terminated the purchase agreement for economic reasons while at the same time withholding other Exxon work product documents (if any) that may undermine this contention.  Accordingly, the Court finds that subject matter waiver is warranted under Rule 502(a).

The Court must next identify and determine the parameters of the disclosed September 25, 2007 Memorandum.  Chick-fil-A argues that subject matter waiver should require production of all documents and information as to actions taken by Exxon to remediate it's Coral Springs property and/or Chick-fil-A's adjacent property, the appraisal

and valuation of the Exxon Site and/or the Chick-fil-A property at issue, and all communications with anyone, including the actual and/or prospective purchasers of the Townhome Property, regarding the subject matter of this action.  The Court, however, finds that Chick-fil-A's interpretation of "subject matter" too expansive.

The unredacted portion of Quiralte's Memorandum reads in full:

> I spoke with Denyse O'Grady of Coral Square, LLC today around 1:15 p.m..  She is the buyer under contract to purchase the Chick-fil-A Property in Coral Springs, Florida.  Denyse was following up on a call we had yesterday.  Yesterday she said that the market has collapsed in the last 45 days so she was considering whether or not to stay in the deal with CFA.  She told me yesterday that she'd call me today with her decision.  She said she had invested about $30,000 in this deal and that she decided to cut her losses.  She said her latest extension expires at the end of the week and that she would not be entering into another extension.  I asked Denyse if there was anything that ExxonMobil could do to make her stay in the deal.  She said no.  She said she has waived all her rights under the contract with CFA except her rights under the environmental provisions.  She said she didn't want to hold on to the property above market value and her only out right now is the environmental provision.  If CFA were to resolve the environmental issue today she'd be forced to close on the property at $500,000 which she is not comfortable doing.  She said the remediation didn't affect her because she would not be building on that parcel (the northern parcel).  Denyse said that she reviewed the MLS listings and that 98 townhomes are available now.  Only 33 units have closed since the beginning of the year and most are under $200k.  For the $500,000 contract price she wanted to sell the units at $275,000, but the market today would only allow her to sell them at $259,000.  She said buyers would have a hard time getting financing because lenders are now expecting 20% down (versus 10% in the past) so there are less buyers out there.  Denyse said external forces have affected the property value.  She said that she would be willing to talk about another deal down the road once the environmental issues are resolved.  She has put Alex Dominguez with CFA on notice that she will not be entering into another extension on this deal.

September 25, 2007 Memorandum (Ex. C, DE 74).  It is clear that the subject matter of the September 25, 2007 Memorandum is the reasons (as given by O'Grady to Quiralte) that Coral Square terminated its contract to purchase the Townhome Property.

The only issue remaining with respect to the scope of the waiver is whether Exxon must produce documents containing opinion work product.  Rule 502 does not distinguish between fact work product and opinion work product.  Prior to the enactment of Rule 502, however, in Cox, 17 F.3d at 1422, the Eleventh Circuit noted that "opinion work product enjoys  nearly absolute immunity and can be discovered only in very rare and extraordinary circumstances."  Id. at 1422 (quoting In re Murphy, 560 F.2d 326, 336 (8th Cir.1977)).  The Cox Court then ruled that "the subject-matter waiver doctrine does not extend to materials protected by the opinion work product privilege."  Id. (citing In re Martin Marietta Corp., 856 F.2d 619, 625-26 (4th Cir.1988)).

The United States Court of Federal Claims recently considered the very issue now before this Court – the effect of Rule 502 on prior binding precedent holding that the "work product waiver only extends to 'factual' or 'non-opinion' work product concerning the same subject matter as the disclosed work product."   Eden Isle Marina, Inc. v. United States, ___ Fed. Cl. ___, No. 07-127, 2009 WL 2783031, at *18 (quoting In re Echostar Commc'ns Corp., 448 F.3d 1294, 1302 (Fed. Cir. 2006)).  Noting that Federal Rule of Civil Procedure 26(b)(3)(B)[8] continues to provide special protection for opinion work product, the court in

---

[8]  Federal Rule of Civil Procedure 26(b)(3)(B) provides that "[i]f the court orders discovery of [work product] materials, it must protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of a party's attorney or other representative concerning the litigation."  Fed. R. Civ. P. 26(b)(3)(B).

<u>Eden</u> stated that "when considering the fairness of granting a subject-matter waiver of work-product protection pursuant to Federal Rule of Evidence 502(a), the court must pay close attention to the special protection afforded opinion work product." <u>Id.</u>  The <u>Eden</u> Court found no authority requiring it to depart from prior precedent and, accordingly, ruled that subject matter waiver of work product protection was limited to fact work product.  <u>Id.</u> at *34.  This Court agrees and, therefore, finds that Rule 502 does not abrogate the Eleventh Circuit's ruling that "the subject-matter waiver doctrine does not extend to materials protected by the opinion work product privilege." <u>Cox</u>, 17 F.3d at 1422. Accordingly, the Court will not require Exxon to produce opinion work product.

<u>Implied "At Issue" Waiver</u>

Chick-fil-A argues that Exxon has impliedly waived its attorney-client privilege and work product protection by placing at issue its good faith efforts to address contamination on the Townhome Property.  Based on this waiver, Chick-fil-A contends that Exxon is required to produce all privileged and non-privileged documents and information pertaining to: the actions Exxon took in response to the alleged contamination; the appraisal or valuation of the Townhome Property; and all communications regarding the subject matter of this action, including communications with the actual and/or prospective purchasers of the Townhome Property (i.e., all topics for which Quiralte was designated as Exxon's corporate representative).

A party may waive the attorney client privilege not only expressly, but also impliedly. The Eleventh Circuit has observed that an implied waiver has been found in three sets of circumstances: "(1) when a client testifies concerning portions of the attorney-client

14

communication, (2) when a client places the attorney-client relationship directly at issue, and (3) when a client asserts reliance on an attorney's advice as an element of a claim or defense."[9] Cox v. Adm'r U.S. Steel & Carnegie, 17 F.3d 1386, 1418 (11th Cir.), modified on other grounds, 30 F.3d 1347 (11th Cir. 1994) (quoting Sedco Int'l S.A. v. Cory, 683 F.2d 1201, 1206 (8th Cir. 1982)).

In Cox, however, the Eleventh Circuit extended the implied waiver doctrine beyond these three circumstances.  The court noted that "the doctrine by implication reflects the position that the attorney-client privilege 'was intended as a shield, not a sword.'"  Id. at 1417 (quoting GAB Business Serve, Inc. v. Syndicate 627, 809 F.2d 755, 762 (11th Cir. 1987)).  "In other words, '[a] defendant may not use the privilege to prejudice his opponent's case or to disclose some selected communications for self-serving purposes.'"  Id. (quoting United States v. Bilzerian, 926 F.2d 1285, 1292 (1991)).  The Cox Court observed that in the three circumstances where courts had found an implied waiver, "the party asserting the privilege placed information protected by it in issue through some affirmative act for its own benefit, and to allow the privilege to protect against disclosure of such information would have been manifestly unfair to the opposing party."  Id. (quoting Pitney-Bowes, Inc. v. Mestre, 86 F.R.D. 444, 447 (S.D. Fla. 1980) (quoting Hearn v. Rhay, 68 F.R.D. 574, 581  (E.D. Wash. 1975)).  The court, therefore, ruled that a party impliedly waives the attorney-client privilege if it "injects into the case an issue that in fairness

---

[9]  None of these circumstances are present in the instant case.

15

requires an examination of otherwise protected communications."[10] Id. at 1419.

To waive a privilege, a party must do more than merely deny the opposing party's accusations; it must affirmatively "inject a new factual or legal issue into the case." Id. at 1419 (quoting Sedco, 683 F.2d at 1206).   The party, however, "need not raise an affirmative defense to inject a new issue into the case, although it frequently occurs that way." Id.   But "a [c]ourt cannot justify finding a waiver of privileged information merely to provide the opposing party information helpful to its cross-examination or because information is relevant." Id. at 1418 (quoting Remington Arms Co. v. Liberty Mut. Ins. Co., 142 F.R.D. 408, 415 (D. Del.1992)).   And the Cox Court noted that "courts have not found [an "at issue"] waiver where the party attacking the privilege has not been prejudiced"; rather, such waiver occurs only when it would be "manifestly unfair" to the opposing party to permit the privilege to protect against disclosure of the information.  Id. at 1417.[11]

Courts recognizing an "at issue" waiver often apply the test set forth in the seminal

---

[10]   This type of waiver is sometimes referred to as an "at issue" waiver. Pyramid Controls, Inc. v. Siemens Indus. Automations, Inc., 176 F.R.D. 269, 272 (N.D. Ill. 1997).

[11]   In Cox, the court ruled that one of the defendants in the RICO action had waived the attorney-client privilege by repeatedly injecting into the case the issue of its knowledge of the law and its asserted belief that its actions were lawful. 17 F.3d at 1418-19. The court concluded that the defendant had gone beyond mere denial of its criminal intent and had affirmatively asserted its good faith.  In so ruling, the Cox Court relied on United States v. Bilzerian, 926 F.2d 1285, 1292 (2d Cir. 1991), in which the criminal defendant announced prior to trial his intention to testify that he believed in good faith that certain disclosures he made to the SEC were legal. The district court advised the defendant that his testimony in that regard would be sufficient to waive the attorney-client privilege, and the Second Circuit later affirmed that decision. Id.

case of Hearn v. Rhay, 68 F.R.D. 574 (E.D. Wash. 1975).[12]  In Hearn, the court considered

three elements in determining whether an implied or at-issue waiver of a privilege had

occurred:  "(1) assertion of the privilege was a result of some affirmative act, such as filing

suit, by the asserting party; (2) through the affirmative act, the asserting party put the

protected information at issue by making it relevant to the case; and (3) application of the

privilege would have denied the opposing party access to the information vital to his

defense."  Id. at 581.  "[W]here these three conditions exist, a court should find that the

party asserting a privilege has impliedly waived it through his own affirmative conduct."

Id.[13]

---

[12]  In Hearn, an action under 42 U.S.C. § 1983, a prisoner-plaintiff challenged his confinement in a prison's mental health unit. The defendant prison officials raised the affirmative defense of qualified immunity, thus placing at issue their objective and subjective good faith. The defendants' knowledge, or disregard, of the plaintiff's clearly established constitutional rights was of obvious relevance. The Hearn Court found that the qualified immunity defense directly placed in issue the defendants' communications with counsel as they related to issues of malice toward the plaintiff and their knowledge of his constitutional rights;  the court concluded the need for this information outweighed the policies underlying the attorney-client privilege.  68 F.R.D. at 580-82.

[13]  The Tenth Circuit has noted that the courts have applied three tests in determining whether an at issue waiver has occurred: (1) the "automatic waiver" rule, which provides that a party automatically waives the privilege upon assertion that a claim or defense raises an issue to which otherwise privileged information is relevant (the least restrictive test); (2) the Hearn test (the intermediate test as described above); and the "anticipatory waiver" test set forth in Rhone-Poulenc Rorer, Inc. v. Home Index. Co. 32 F.3d 851 (3rd Cir. 1994), which provides that the privilege is waived if a party places in issue its reliance upon counsel's advice (the most restrictive test).  See Frontier Refining, Inc. v. Gorman-Rupp. Co., Inc., 136 F.3d 695, 699 (10th Cir. 1998); see also Union County, Iowa v. Piper Jaffray & Co., Inc., 248 F.R.D. 217, 219 (S.D. Iowa 2008) (for a discussion of the Hearn and Rhone tests).  The Hearn test has been characterized as the "majority view."  Id. at 221.  Although the Eleventh Circuit in Cox did not expressly adopt the Hearn test, it cited to Jitney Bowls, Inc. v. Maestro, 86 F.R.D. 444 (S.D. Fla. 1980), which had considered the Hearn factors.

17

According to Chick-fil-A, "at its core, Chick-fil-A's Motion asserts that Exxon has waived the attorney-client and work product privileges by allowing Ms. Quiralte to testify based on privileged information and then improperly manipulated the privilege to its advantage."  Reply at 4 (DE 82).  Chick-fil-A repeatedly argues that Quiralte relied on the privileged September 25, 2007 Memorandum when testifying that Exxon acted in "good faith" to address its contamination.  By way of example, Chick-fil-A states that "Exxon's counsel permitted Ms. Quiralte . . . to rely on her internal memorandum labeled 'Core Attorney Work Product' . . . when the document and Quiralte's testimony supported Exxon's case, but then instructed [her] not to answer the remaining, related questions on the grounds of 'attorney-client privilege' when the questions concerned other actions (or lack of action) taken by ExxonMobil to address contamination on the Chick-fil-A property."  Motion at 2 (DE 74).  Chick-fil-A also states that Quiralte used the Memorandum to support her testimony "that  Exxon acted in 'good faith' to address its contamination."  Reply at 1 (DE 82).  Chick-fil-A goes so far as to label one argument – "It is Undisputed that Exxon Relied on Privileged Material in Support of its Good Faith Defense."  Reply at 5 (DE 82). A careful review of Quiralte's deposition transcript, however, shows that Chick-fil-A mischaracterizes Quiralte's testimony.  The only privileged document (the September 25, 2007 Memorandum) Exxon produced and the only substantive testimony Quiralte gave relying on the privileged Memorandum pertained solely to the reasons O'Grady gave for terminating Coral Square's agreement to purchase the Townhome Property.  Despite Chick-fil-A's repeated assertions, it cannot be fairly said that Quiralte relied on the protected Memorandum to support her testimony in any other respect, including her

testimony as to Exxon addressing the contamination.

Aside from relying on the work product Memorandum to support Exxon's position as to the reasons why Coral Square terminated the purchase agreement (which the Court has addressed above), Quiralte referred to the September 25, 2007 Memorandum on only two other instances. First, Quiralte testified about an appraisal of the Townhome Property that a third-party had prepared for Exxon. Chick-fil-A's attorney then asked whether Quiralte had reviewed any other notes, memoranda, or other documents that refer to the value of the Townhome Property. Quiralte merely responded that the September 25, 2007 Memorandum reflected that O'Grady had told her she was under an obligation to purchase the property for $500,000. Second, in response to Chick-fil-A's question whether O'Grady had ever told Quiralte what her costs related to the contamination were, Quiralte responded that, as she had documented in her September 25, 2007 Memorandum, O'Grady had advised that she had incurred $30,000 in expenses

Chick-fil-A additionally contends that Quiralte <u>repeatedly</u> testified that Exxon acted in good faith in its negotiations with Chick-fil-A and O'Grady. It bases its argument that Exxon injected a "good faith defense" into the litigation – thereby putting its "good faith" at issue – on the following deposition testimony of Quiralte. In response to Chick-fil-A's inquiry as to whether Exxon ever informed O'Grady that it would remediate the Townhome Property, Quiralte stated:

> I don't know if those words were ever used exactly. But in conversations with Ms. O'Grady, we [Exxon] were making <u>a good-faith effort</u> to coordinate actions that needed to be taken on the property so she could get her permits from Broward County. She was aware that we had asked for access to the property so we could collect current data. And we could

> delineate the extent of the issue, get a better understanding of
> it.

Quiralte Dep., at 37:1-9 (DE 74) (emphasis added).

Chick-fil-A's attorney later asked Quiralte to explain what she meant by Exxon's good faith effort to work with O'Grady.  Quiralte explained her previous answer:

> Well, what I mean is we [Exxon] had limited information that
> we had received from Chick-fil-A.  We understood that Ms.
> O'Grady wanted to develop the property, and so we had to
> make some assumptions about what the data showed.  What
> we [Exxon] were trying to do was work with her so that we
> could meet her objectives and get a better understanding of
> what it was going to take to get there.

Quiralte Dep., at 54:18-25 (DE 74).

And when Chick-fil-A's attorney asked Quiralte what she was basing Exxon's good faith effort on, she responded:  "I think I described that in a previous answer.  I think we can refer to that answer, but in our – my communications with Ms. O'Grady trying to understand her time frame, her objectives, and what we [Exxon] could do to help her meet those objectives with the limited amount of information we had at the time."  Quiralte Dep., at 56:12-22 (DE 74).

To the extent that Chick-fil-A contends this testimony relates to Exxon addressing (or attempting to address) contamination on the Townhome Property, it is clear that Quiralte did not rely on any information protected by the attorney-client privilege or work product doctrine.  Quiralte's conversations were with a third-party (O'Grady), and as such, were not protected by the attorney-client privilege.  And the work product document that Exxon produced (the September 25, 2007 Memorandum) pertained only to the reasons O'Grady gave for terminating the purchase agreement; it said nothing whatsoever about

20

addressing contamination.

Nor does the Court find from this testimony that Exxon has impliedly waived the attorney-client privilege or any work product protection by injecting the issue of "good faith" into the litigation.  First, the Court does not believe that Quiralte's testimony rises to the level of a good faith "defense."  And it is questionable whether Exxon has even "affirmatively inject[ed] a new factual or legal issue into the case." Cox  17 F.3d at 1419. Chick-fil-A, not Exxon, is the party who has put Exxon's remediation of the (alleged) contamination or lack thereof at issue in this action.  Moreover, Exxon is not attempting to use privileged information (the September 25, 2007 Memorandum) as a sword with respect to any contamination issue.  Quiralte merely responded to an inquiry by Chick-fil-A as to whether Exxon had informed O'Grady that it would remediate the contamination. Additionally, Chick-fil-A has failed to show that whether or not Exxon attempted to remediate in "good faith" is relevant to any claim or defense herein.  Simply uttering the words "good faith" does not make good faith material to the resolution of any issue of fact or law in this case.

The implied waiver doctrine is predicated on principles of fairness.  Fairness may compel a finding of an implied waiver when a party asserts a claim or defense that "requires examination of protected communications." Bilzerian, 926 F.2d at 1292 (emphasis added).  Here, Chick-fil-A has not demonstrated how Quiralte's utterance of the phrase "good faith," which does not implicate, either explicitly or implicitly, privileged information,  requires its examination of all of Exxon's privileged information.  The Court does not find that Chick-fil-A would be prejudiced or that it would be "manifestly unfair" to

permit Exxon to withhold privileged information and documents pertaining to all topics on which Quiralte was designated to testify, including the (alleged) contamination, the appraisal or valuation of the Townhome Property, and all communications regarding the subject matter of this action, as Chick-fil-A contends.  Indeed, it would be unfair to require Exxon to provide such sweeping privileged information and documents based on the production of a one-page memorandum pertaining only to the reasons given by O'Grady for terminating the purchase agreement.

<u>Adequacy of Preparation for Rule 30(b)(6) Deposition</u>

Chick-fil-A argues that Exxon violated its duty to adequately prepare Quiralte to testify as its 30(b)(6) corporate representative.  In support of this argument, Chick-fil-A contends that Quiralte was unable to testify as to "<u>most of the key questions</u>" it asked. According to Chick-fil-A, these questions were clearly relevant and squarely within the noticed matters; yet, Quiralte answered "I don't know" to a "<u>majority</u> of such questions." Motion at 2 (DE 74) (emphasis added).  Chick-fil-A moves the Court to compel Exxon to make Quiralte available for continued deposition and to order her to respond fully and completely to the topics identified in the Notice of Taking 30(b)(6) Deposition.

It is "well-established that a 30(b)(6) deponent [has] an affirmative obligation to educate himself as to the matters regarding the corporation." <u>Calzaturfico S.C.A.R.P.A. s.p.a v. Fabiano Shoe Co.</u>, 201 F.R.D. 33, 36 (D. Mass. 2001); <u>see</u> <u>also</u> <u>Poole ex rel. Elliott v. Textron, Inc.</u>, 192 F.R.D. 494, 504 (D. Md. 2000) ("Upon notification of a deposition, the corporation has an obligation to investigate and identify and if necessary prepare a designee for each listed subject area and produce that designee as noticed.");

Dravo Corp. v. Liberty Mut. Ins. Co., 164 F.R.D. 70, 75 (D. Neb. 1995) ("If the persons designated by the corporation do not possess personal knowledge of the matters set out in the deposition notice, the corporation is obligated to prepare the designees so that they may give knowledgeable and binding answers for the corporation.").

The court in Calzaturfico explained the necessity of preparing a 30(b)(6) witness:

> Rule 30(b)(6) explicitly requires [a company] to have persons testify on its behalf as to all matters known or reasonably available to it and, therefore, implicitly requires persons to review all matters known or reasonably available to it in preparation for the 30(b)(6) deposition. This interpretation is necessary in order to make the deposition a meaningful one and to prevent the "sandbagging" of an opponent by conducting a half-hearted inquiry before the deposition but a thorough and vigorous one before the trial. This would totally defeat the purpose of the discovery process.... [P]reparing for a Rule 30(b)(6) deposition can be burdensome. However, this is merely the result of the concomitant obligation from the privilege of being able to use the corporate form in order to conduct business....[A company] does not fulfill its obligations at the Rule 30(b)(6) deposition by stating that it has no knowledge or position with respect to a set of facts or area of inquiry within its knowledge or reasonably available. . . .

201 F.R.D. at 36 (quoting United States v. Taylor, 166 F.R.D. 356, 362 (M.D.N.C., 1996), aff'd, 166 F.R.D. 367 (M.D.N.C. 1996)).

"On the other hand, the corporation's obligation under Rule 30(b)(6) does not mean that the witness can *never* answer that the corporation lacks knowledge of a certain fact. The absence of knowledge is, by itself, a fact that may be relevant to the issues in a given case." Fraser Yachts Florida, Inc. v. Milne, No. 05-21168-Civ-Jordan, 2007 WL 1113251, at *2 (S.D. Fla.  Apr. 13, 2007) (Torres, Mag. J.) (emphasis in original); see also Costa v. County of Burlington, 254 F.R.D. 187, 190 (D.N.J. 2008) ("Simply because defendant's

witness could not answer every question posed to him does not equate to the fact that defendant did not satisfy its obligation to prepare its 30(b)(6) witness."); Wilson v. Lakner, 228 F.R.D. 524, 529 n. 7 (D. Md. 2005) ("There is no obligation to produce witnesses who know every single fact, only those that are relevant and material to the incident or incidents that underlie the suit"; court noted that a "rule of reason" applies in determining adequacy of preparation for a 30(b)(6) deposition).

After thoroughly reviewing Quiralte's entire deposition testimony, the Court strongly disagrees with Chick-fil-A's representation that Quiralte was unable to answer the "majority" or even "most" of the key questions.  To the contrary, Quiralte was able to answer the majority of questions posed, and her testimony was responsive and informative.  Indeed, Chick-fil-A identified only a few questions that Quiralte was unable to answer during her deposition, such as whether Exxon contacted regulatory officials in 2006, whether Exxon met with those officials in 2007, whether Exxon's Risk Manager was provided O'Grady's phone number in July 2006, and what the Risk Manager discussed in a particular conversation with Chick-fil-A's attorney (the same attorney asking the question).

In addition, Chick-fil-A contends that even though Quiralte testified that Exxon had provided Chick-fil-A with a draft agreement to permit Exxon access to Chick-fil-A's property, she was "utterly incapable of testifying on Exxon's execution of it."  Motion at 5 (DE 74).  Although Quiralte did not know the exact date the access agreement was signed, she testified that it was at the end of or after September 2007.  Quiralte, however, was unable to testify as to how long it took Exxon to respond to Chick-fil-A after Chick-fil-A had

provided comments on the draft access agreement.  Quiralte was also unsure whether David Bates (with Exxon) had changed the access agreement in 2008 before it was signed.

Finally, Chick-fil-A contends that Quiralte was "even unable to recall the number of times she spoke to O'Grady."[14]  Motion at 5 (DE 74).  Although she was unable to give the exact number, Quiralte testified that she had three to five conversations with O'Grady, and she testified to the contents of those conversations.

These few questions identified by Chick-fil-A do not demonstrate that Exxon failed to adequately prepare Quiralte for her 30(b)(6) deposition.  Accordingly, the Court will not require Exxon to again submit Quiralte for deposition.

### Obstruction of Deposition by Exxon's Attorney

Chick-fil-A also argues that Exxon's attorney unfairly obstructed Quiralte's deposition.  According to Chick-fil-A, during the two-and-a-half hour deposition, Exxon's attorney objected more than 100 times and instructed the witness not to testify more than 40 times.  The Court has not verified the precise numbers provided by Chick-fil-A, but Quiralte's deposition transcript reflects that the vast majority of objections made by counsel (and his instructions not to answer) were based on grounds of privilege and, therefore, were entirely appropriate.  See Fed. R. Civ. P. 30(c) (providing that an attorney may instruct a deponent not to answer to preserve a privilege).  In other instances, after Chick-fil-A's counsel had repeatedly asked the same question, Exxon's counsel did object that it had

---

[14]  The Court notes that the deposition citation given by Chick-fil-A to support this contention (56:23-25) reflects that Chick-fil-A actually asked Quiralte if she remembered the number of e-mails she sent to O'Grady.

been "asked and answered."  Notwithstanding the objection, however, Exxon's attorney permitted the witness to answer in most instances.  Counsel also objected on a few occasions on the ground that the question called for a legal conclusion when Chick-fil-A's attorney attempted to have Quiralte testify whether certain communications constituted settlement discussions.  After examining the entire deposition transcript, the Court finds that Exxon's attorney did not improperly obstruct Quiralte's deposition or prevent Chick-fil-A from obtaining discovery.

Chick-fil-A additionally contends that Exxon's counsel "repeatedly crossed the line and coached the witness substantively," adding that "[t]hroughout the deposition, counsel for ExxonMobil testified in place of the witness."  Motion at 2 (DE 74).  Chick-fil-A provides the following examples:

1.    When the witness was asked (repeatedly) what topics and what period of time she was designated to testify about, Exxon's attorney clarified those areas and time periods;

2.    When the witness was asked whether she had any documents reflecting her conversations with O'Grady, Exxon's attorney responded that they had "one set of notes" (the September 25, 2007 Memorandum);

3.    When the witness was asked the reason she had produced the September 25, 2007 Memorandum, Exxon's counsel responded that he (and not the witness) had produced it and that the witness did not know the reason

4.    When the witness was asked if she had reviewed any other memoranda to the file in preparation for the deposition,  Exxon's attorney objected that her response would

reveal attorney work product and stated that the witness had already testified several times that she did not have any documents other than the September 25 Memorandum.  He informed Chick-fil-A's attorney that he could properly ask the witness whether she reviewed any memoranda to refresh her recollection;

5.    When  the  witness  was  asked  whether  she  was  to  testify  about communications between Exxon and Chick-fil-A, Exxon's attorney responded that she was to testify for the time period she had previously identified; and

6.    When asked if Exxon had conducted any evaluations with respect to whether the contamination had migrated to the Townhome Property based on the EE&G report, Exxon's attorney objected because Chick-fil-A's attorney had already inquired about such evaluations and the witness had testified she was not aware of any such evaluations. Chick-fil-A's attorney stated that he had not asked about evaluations based on the EE&G report.  Exxon's attorney responded that he could ask a million questions, changing the "based on entity" and the witness's answer would still be that she was not aware of any such evaluations.

The Court does not find that these instances constitute coaching the witness or testifying substantively for Quiralte.

<u>Summary</u>

For the foregoing reasons, it is hereby ORDERED that Chick-fil-A's Motion to Compel is GRANTED to the extent that Chick-fil-A requests the Court to find a waiver of the work product doctrine by Exxon's voluntary production of the September 25, 2007 Memorandum and is DENIED in all other respects.  Accordingly, on or before November

17, 2009, Exxon shall produce to Chick-fil-A all documents, including its fact work product,

reflecting the reasons Coral Square terminated the contract with Chick-fil-A to purchase the

Townhome Property.  If any such document contains opinion work product, Exxon may

redact that information from the document.[15]

DONE AND ORDERED in Fort Lauderdale, Florida, this 10th day of November

2009.

BARRY S. SELTZER
United States Magistrate Judge

Copies to:

All counsel of record

---

[15]  The Court has reviewed the unredacted version of the September 25, 2007 Memorandum *in camera*, and finds that the redacted two sentences reflect attorney Quiralte's mental impressions of her conversation with O'Grady.  As such, the redaction information is pure opinion work product.  Accordingly, Exxon is not required to produce an unredacted copy of the Memorandum.